592 So.2d 831 (1991)
Sharon E. NOLAN
v.
JEFFERSON DOWNS, INC., et al.
No. 90-CA-746.
Court of Appeal of Louisiana, Fifth Circuit.
December 11, 1991.
Rehearing Denied February 14, 1992.
Writ Denied April 20, 1992.
*833 Thomas W. Mull, Covington, for plaintiff/appellee.
James David McNeil, Ruston, and W.K. Christovich, New Orleans, for defendants/appellants.
Before KLIEBERT, GAUDIN, WICKER and GOTHARD, JJ., and FINK, J. Pro Tem.
WICKER, Judge.
Jefferson Downs, Inc.; John C. Thorn, M.D.; and Sharon E. Nolan, the defendants and plaintiff respectively in this personal injury suit, all appeal a judgment in favor of Nolan. We affirm in part, reverse in part, modify in part, and render.
Many issues are before us: whether Nolan's failure to wear goggles or seek additional medical care constituted negligence; whether Thorn was an employee of Jefferson Downs or an independent contractor; whether a violation of the Rules of Racing is negligence per se and caused Nolan's injury; whether Nolan's damages were properly calculated; whether Nolan's original injury was aggravated by any action or inaction on the part of Thorn; whether or not the jury instructions and interrogatories were clear and consistent; and whether motions J.N.O.V. and for a new trial were improperly denied.
Nolan is a jockey who was exercising her horse at Jefferson Downs Racetrack the morning of October 1, 1982. A runaway horse ran by, dislodging a clump of mud which flew up and struck her in the eye. She had safety goggles perched atop her hat but was not wearing them at the time of the accident.
She went to the first aid station, and nurse Margaret Edwards treated her. She saw Thorn that evening. On October 5th, Nolan saw Edwards again, who sent her to Dr. Charles Odom, the track physician. Odom referred her to an eye specialist. Nolan had a torn retina with some detachment, and she was ultimately advised that she could no longer participate in competitive horse racing.
Nolan sued Thorn, Edwards, Odom and Jefferson Downs, individually and as the *834 employer of Thorn, Edwards, and Odom. Odom died before trial, and the judge dismissed the suit against him. Edwards settled Nolan's claims and the judge dismissed the suit against her as well.
The jury found that Thorn, Jefferson Downs, Edwards, and Odom were negligent; it found Nolan not negligent. It found that only the negligence of Thorn and Jefferson Downs was actually a cause in fact of Nolan's injuries. It found Jefferson Downs had violated a statute in the staffing of its first aid room and that the violation was a cause in fact of Nolan's injuries. It also found Thorn, Edwards, and Odom to be employees of Jefferson Downs. It finally assigned percentages of fault to each defendant: Thorn 2.5%, Jefferson Downs 75%, Edwards 2.5%, and Odom 20%. However, since the jury had already decided that the negligence of Odom and Edwards did not cause Nolan's injuries, it awarded Nolan only 77.5% of her damages although she was without fault.
Jefferson Downs and Nolan each moved for a new trial or for a judgment notwithstanding the verdict. Both motions were denied.
THE VERDICT
The jury interrogatories were conflicting. They found Odom 20% at fault but deemed him not liable. They found Edwards 2.5% at fault but deemed her not liable. Consequently the jury assessed only 77.5% of the liability for Nolan's damages. The jury's failure to assess 100% of the liability in this case is reversible error. Lawrence v. Dunaway, 554 So.2d 1339 (La. App. 1st Cir.1989). (In that case, a jury assessed 20% of the fault to dogs crossing the road; and dogs are not subject to an assessment of fault.) See also concurring opinion in Beauhall v. Sears, Roebuck, Company, 532 So.2d 104 (La.1988). The judgment exonerated Nolan from fault. Therefore the jury implicitly assessed 100% of the liability to the defendants it felt caused Nolan's damages: Thorn and Jefferson Downs. We modify the judgment to apportion the entire liability between Thorn and Jefferson Downs.
We agree with both Jefferson Downs and Nolan that the better time to have corrected this contradiction was pursuant to their post-trial motions immediately after trial. A remand for retrial is unnecessary, since we have a complete record upon which to render a judgment. Gonzales v. Xerox Corp., 320 So.2d 163 (La. 1975); Parliman v. Kennelly, 520 So.2d 445 (La.App. 5th Cir.1988).
THE COMPARATIVE NEGLIGENCE OF NOLAN
Jefferson Downs argues that Nolan was at fault in causing her own injury because she was not wearing her goggles at the time of the accident. It claims that, had she done so, her eye would have been protected. Nolan admits that she had her goggles pushed up on the helmet while she was exercising the horse. However, she argues that there was no requirement to wear goggles during exercise periods, it was not the custom of jockeys to wear goggles under these circumstances, and in fact it was frequently dangerous to do so. Goggles are more likely to fog up during morning exercise runs because they last longer than races.
Several jockeys testified on behalf of Nolan that goggles were worn only when the jockeys were working "in company", i.e. with other horses galloping on either or both sides. They were unanimous in their opinion that Nolan was a safe rider. Brian G. Krantz, vice-president and general manager of Jefferson Downs, and Odom disagreed that she was a safe rider.
Jefferson Downs also argues that Nolan was negligent in failing to seek medical attention sooner, given her complaints of discomfort, redness, and visual blurriness or distortion. Except for riding in three races on the evening of October 1st and one October 2nd, however, she testified that she spent the time between the injury and her visit to the first aid room on October 5th resting in her apartment near the race track. Most importantly, she did nothing but rest between the accident and Thorn's clearing her to ride. When the eye did not improve as other black eyes had, she went back to the first aid room for *835 further attention. She explained her decision to ride her mounts on October 1st and 2nd as based upon Thorn's assurances that she was all right and could ride, since he had the authority to pull her off her mounts for her own safety and that of the other jockeys.
Not one person testified that Nolan deviated from safe practices for jockeys in not wearing goggles while exercising. Not one person, including the medical experts, faulted Nolan for waiting quietly in her apartment between the time of the accident and seeing Thorn that night.
Jefferson Downs and Thorn had the burden of proving Nolan's comparative negligence, and we believe they have failed to meet that burden. We find that Nolan was not negligent in either failing to wear goggles or to seek other medical attention sooner.
THE LIABILITY OF EDWARDS
Edwards is a licensed practical nurse who has staffed the first aid room at Jefferson Downs for several years. She was hired by Odom and paid by the track. She was under Odom's supervision, but his instructions were mostly administrative and had to do with ordering supplies. We discuss her liability only to determine whether Jefferson Downs is vicariously liable for her conduct.
Nolan came to her complaining of dirt in her eye. She looked at the eye and found it pink. She palpated it while she was irrigating it with Dacroise, an over-the-counter irrigating solution. Then she put Pontocaine, an ophthalmic narcotic, into the eye. She testified she told Nolan to see E.L. Leckert, M.D., an ophthalmologist, and also told her she could go right to the emergency room without waiting to see the track doctor. Nolan, however, testified that Edwards told her she could see Thorn that night. Joseph Soileau, Nolan's agent, confirmed her testimony.
Celia Krebs, R.N. and L.P.N. was qualified as an expert in emergency and first aid nursing. In her opinion, if Edwards administered Pontocaine twice without a doctor's orders, did not patch the eye, and did not call in a doctor or refer Nolan to a doctor, then her behavior fell below the standard of care for nurses.
Sandra Dawes, R.N. was qualified as an expert in both registered and practical nursing. She also had personal experience as a first aid nurse. Irrigating Nolan's eye and taking a very general history is within the standard of care for practical nurses. The failure to do a visual acuity test and refer Nolan to a doctor in her opinion was not below the standard of care.
The various doctor witnesses testified that strenuous activity on Nolan's part probably exacerbated the damage to her eye. However, there was no evidence that Nolan engaged in strenuous activity between the time she saw Edwards in the morning and the time she saw Thorn in the evening in the first aid room. For instance, Nolan had her agent take her off the rest of her exercise mounts that morning.
The testimony does not support the conclusion that Edwards was negligent in failing to send Nolan to an eye doctor and in using Pontocaine in her eye. We reverse the finding of negligence and conclude that Jefferson Downs has no liability as Edwards' employer.
THE LIABILITY OF THORN
Thorn testified his license had been suspended and he was sent to jail in 1977 for writing prescriptions for controlled dangerous drugs. He was operating with a limited license. Nolan came in at 6:15, dressed to ride, the evening of her accident and asked him to look at her eye because she didn't want to get a black eye. She didn't complain of pain or discomfort or recite any symptoms that would indicate she couldn't ride. His examination, which lasted three or four minutes, consisted of checking the eye for foreign bodies with an otoscope (the ophthalmoscope had been sent out for repair). If he said his examination took fifteen minutes in his deposition, then that was a mistake. Nolan's eye was bloodshot: she had conjunctivitis and minute hemorrhages. He gave Nolan ananase, a blood thinner, which relieves pain and swelling. It increases blood flow and *836 helps clear out the discoloration on the outside of the eye. He had the authority to keep a jockey from riding if he thought she was unable to do so, both for her own and the other jockeys' safety. He testified he told Nolan she should see an ophthalmologist before riding that night. He didn't tell her it was okay to ride, but he didn't tell her she couldn't ride. He didn't notify the stewards, although it's part of his job to follow up and notify the stewards.
Some jockeys testified that they didn't know Thorn was unlicensed. However, Krantz testified that he never had any complaints from any of the riders about Thorn. When Odom died, the Jockey Guild voted to keep Thorn on as track physician until this litigation started.
Edwards testified that Thorn examined Nolan's eye for several minutes, using both the room light and the ophthalmoscope [otoscope?]. He didn't dilate the eye, but she thinks he had Nolan look at the eye chart. Edwards was sure Thorn asked Nolan if her vision was impaired, and she didn't recall whether or not Nolan complained of pain. Thorn gave her ananase and told her she should take off and see either Odom or Leckert, although Nolan said she had to ride.
Earl Nelson, M.D., Nolan's expert in ophthalmology, testified he first examined Nolan in August of 1988. Nolan's symptoms could have been caused by corneal abrasion, traumatic iritis, or contusion. Depending on the cause, strenuous activity might worsen the condition. In Nolan's case, if she had a retinal hole or tear from the dirt clump, "there is no question that whatever that condition was at the time was made worse by that physical activity." Most first aid doctors would put in a fluorescein dye to examine the external eye for abrasions but would have no way of knowing what's happening to the inside of the eye. He testified that he questioned whether ananase is effective for anything, and he would have at least prescribed an antibiotic if he had been the first aid doctor. Assuming no ophthalmoscope or otoscope, and that Thorn only looked at Nolan from across the room and told her she could ride in the race, this would not be the appropriate standard of care for a first aid room anywhere. Assuming a retinal tear, riding in three races more likely than not aggravated significantly Nolan's preexisting condition.
John S. Magee, M.D. was an internist who operates a number of primary care clinics where he treats a number of eye injuries on a regular basis. He also works at the first aid station at the Fairgrounds during the Jazz Festival. If Thorn did not check visual acuity, look at the eye with an ophthalmoscope, numb the eye and stain it with fluorescein, remove foreign particles or refer the patient elsewhere, look under the lid, and check the range of motion of the eye, his care would fall below the standard for physicians who are not ophthalmologists. Until he was sure there was no retinal detachment or tear, he would allow Nolan to do hardly anything but get to an ophthalmologist. He would patch her eye, not allow her to drive, and have an ophthalmologist on the phone before she left his clinic. Assuming a small retinal tear, it is more likely than not that riding aggravated it. Assuming one of the effects of ananase is increased blood flow, it would be contraindicated. Assuming Thorn didn't examine Nolan, didn't look in the eye, didn't talk to her for more than ten seconds, and didn't talk to her about going to an ophthalmologist, this would be below the appropriate standard of care.
William Rachal, M.D., an expert ophthalmologist with a practice confined to diseases and surgery of the retina and eye, testified he first saw Nolan in February of 1989. In his opinion, assuming trauma to the eye with dirt, pain and redness progressing through the day, and minor vision loss, his actions would depend upon what he found upon examination. If he found serious injury, he would have recommended against participation in vigorous activity. If he didn't find serious injury, even with the same symptoms, he probably would not object to vigorous activity. Assuming a small tear of the retina, vigorous activity will frequently cause progression of a retinal tear to a retinal detachment, a more serious problem which might require major *837 surgery to fix, and more bleeding. When an eye is injured, usually what happens is that you have a blow, the eye expands and the tissues tear, and the subsequent flow of fluid through the tear causes the actual detachment. The only way you know you have a retinal detachment is for someone to look in the eye. Once you reach that point, if you are up and about it will progress. For Nolan, decrease in activity was necessary to stop further progression of her detachment. It is more likely than not that, if Nolan had gone to bed and not strenuously exercised, she would have required less extensive treatment. If she developed more hemorrhage in the eye during the delay, that was a detrimental factor; but she would still have some problem just from the injury itself. In his opinion, the delay combined with allowing her to ride aggravated her preexisting condition.
All of the damage that she had in her eye when I saw her six and a half years from the time that she was injured, was the result of a direct blow to the eye that compressed the eye. And these findings, as I've later seen, are substantially the same as Dr. Nix' findings shortly after the injury.... everything that I found in her eye is compatible with the history of being hit in the eye with the mud. And that is in all likelihood when all of these occurred.
But it's more likely than not, in his opinion, that riding in the races aggravated the condition.
Ralph R. Nix, M.D. was a specialist in diseases and surgery of the retina and Nolan's treating physician. His examination revealed visual acuity of 20/40, chorioid retinal rupture in the macular region, an avulsion of the vitreous base, and two or three small retinal tears with the retina beginning to detach at its edge. Examination with an ophthalmoscope might not have revealed the retinal tears. In his opinion, Nolan's visual problems were due to the original injury of the mud hitting her eye and not to the retinal detachment or tears which were at the very edge of the retina. It was the chorioid rupture which left Nolan with scars in the macula. When he last saw Nolan in March of 1987, he found her retina attached "with on [out?]" residual effects from the tears or the detachment.
Nolan testified that, after having rested at her apartment all day, she came to the first aid room with her eye extremely irritated and red, with some pain, and with blurred vision. She told Thorn she had gotten hit in the eye and asked him to look at it. Edwards told Thorn she had come in that morning with dirt in her eye and that she irrigated the eye. She didn't have a chance to tell Thorn her eye was hurting because he was attending to another patient, and he didn't ask her if it was hurting. Thorn told her he had something that would clear it right up and had Edwards give her ananase. Thorn did not examine her eye at all and said it was okay for her to ride that night. Had she known Thorn was unlicensed, she would not have taken the drug he gave her or relied on his medical opinion or ridden that night without having seen a licensed physician. Neither Thorn nor Edwards referred her to an eye doctor; and, if they had done so, she would have gone. When Thorn saw her later he said, "Sorry to hear about your eye. We're sorry. We had no idea it was serious."
The evidence for assessing liability to Thorn for Nolan's damages is not unanimous. However, we find that Thorn's care of Nolan's eye injury was below the appropriate standard for doctors in general and that her injuries were exacerbated by his failure to refer her immediately to an ophthalmologist and to take her off mounts the evening of October 1st. We believe he should have looked at the eye, examined Nolan for vision loss, used fluorescein dye to check for foreign bodies, examined the eye with an ophthalmoscope, bandaged the eye, referred Nolan to an ophthalmologist, forbidden her to ride, and notified the stewards. He did none of these things. We affirm the verdict finding Thorn negligent and finding his negligence a cause of Nolan's damages. We modify the jury's finding that he was 2.5 percent liable, since we believe that the evidence supports an assignment of fault of 50 percent.
*838 THE LIABILITY OF ODOM
Odom testified by deposition that he had an "arrangement" with Jefferson Downs for about twenty years to provide physicians for the track and used Thorn most of the time. Jefferson Downs paid him $100 per night and he, in turn, paid Thorn $75 per night for his services out of his personal account. Thorn had an excellent reputation as an obstetric-gynecological surgeon. When he hired Thorn in 1979, he was aware of his suspension from the practice of medicine for illegally prescribing drugs.
Thorn testified Odom employed him, paid him, and supervised him. He said Odom was at the track frequently and knew what was going on. However, Krantz testified Odom hardly came around any more.
The testimony supports the conclusion that Odom was negligent in hiring and supervising Thorn and that his was 20% of the total fault. He delegated his medical duties to a convicted felon with a restricted license and a specialty in gynecological surgery and then failed to supervise him. Also, since Odom was directly responsible for hiring and supervising Thorn, we believe that his actions did cause or contribute to Nolan's injury and damages. Odom died prior to trial, and Nolan did not join his succession as defendant. The judge dismissed him from the suit, and obviously he cannot be held liable at this point. His fault is relevant only so far as Jefferson Downs is his employer and can be held responsible under the theory of respondeat superior.
THE LIABILITY OF JEFFERSON DOWNS
Krantz testified that the Jockey Guild requested Odom be track physician, and Odom was retained by Jefferson Downs from year to year starting in the early sixties. He assigned doctors to work the track and rarely came to the races in the eighties. Jefferson Downs relied upon Odom's expertise in choosing these doctors. The track physician was on call in the first aid room and also handled any emergencies which arose among the track patrons. The rules of racing and Louisiana statutes require a doctor's attendance during racing hours. No one at Jefferson Downs had direct control over Thorn with regard to the manner in which he discharged his medical duties. Krantz believed that Thorn was not a track employee. He was not paid by Jefferson Downs. Krantz had no medical training or expertise and would not presume to tell a doctor how to practice medicine. He didn't believe Thorn was an unlicensed doctor although he was not licensed to fully dispense medication. Odom was Thorn's supervising physician and supervised the medical care at Jefferson Downs.
Thorn testified he had a limited license to practice medicine at the time of Nolan's injury, but it permitted him to do the kind of things he did at Jefferson Downs. Odom paid him, he was accountable to Odom, and Odom supervised him. Jefferson Downs did not employ him or control his daily medical activities. However, Jefferson Downs controlled his right to work there and could have terminated him at any time.
We believe that there is evidence sufficient to conclude that Jefferson Downs is vicariously liable for the conduct and actions of Odom, who was admittedly employed by the track; and we affirm the jury's conclusion. We find Jefferson Downs solidarily liable with Odom to the extent of 20% of Nolan's damages. The only factual question is Thorn's employer.
Odom selected, employed, and supervised Thorn, delegating his own employment duties to Thorn. An employment relationship contains elements of selection and engagement, payment of wages, and power of dismissal and control. The most important factor is the employer's right of control, whether or not it is exercised. Sparks v. Progressive American Ins. Co., 517 So.2d 1036 (La.App. 3rd Cir.1987), writ denied 519 So.2d 106 (La.1987). Most of these elements are missing here: selection, engagement, payment of wages, and control. In this case the power of dismissal is insufficient in and of itself to support a finding that Thorn was the employee of Jefferson Downs. We hold that it is not *839 therefore vicariously liable for Thorn's negligence; and we reverse this finding.
We affirm the finding that Jefferson Downs is individually liable. It violated Rule of Racing Sec. 35:57, promulgated under the authority of La.R.S. 4:4, which requires the track to "Provide, equip and operate an adequate first aid room "and to provide "a licensed physician" during racing hours. The track failed to provide proper equipment for diagnosis of eye injuries: an ophthalmoscope and fluorescein dye. It also failed to provide a licensed physician, providing instead a convicted felon with a restricted license and a specialty in gynecological surgery.
Violation of this statute is negligence per se and it is actionable if it is a cause of Nolan's damages. Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (La.1962).
A statute generally imposes a duty; and if violation of that duty results in the harm the statute was designed to prevent, then there is liability. Pierre v. Allstate Insurance Company, 257 La. 471, 242 So.2d 821 (La.1970). However,
[n]egligence is only actionable where it is both a cause in fact of the injury and a legal cause of the injury. Legal cause requires a proximate relation between the actions of a defendant and the harm which occurs and such relation must be substantial in character....
Sinitiere v. Lavergne, 391 So.2d 821, 825 (La.1980) (citations omitted). If violation of a statute creates a presumption of negligence, then the burden of proof shifts to the violator of the statute to exculpate himself from negligence. Tolbert v. Ryder, 345 So.2d 548 (La.App. 3rd Cir.1977). Violation of a safety statute is civil negligence "but is actionable only when it is shown that failure to follow a statute was a legal cause of the accident." Martyniuk v. DL-Mud, Inc., 526 So.2d 846, 848 (La. App. 1st Cir.1988), writ denied 531 So.2d 276 (La.1988).
Duty/risk analysis in this case entails four inquiries: whether violation of the rules of racing was a cause in fact of Nolan's eye problem, whether Jefferson Downs had a duty under the statute to protect her against exacerbation of her injury due to negligent medical treatment, whether Jefferson Downs breached that duty, and whether Nolan was damaged as a result. Morrison v. Johnston, 571 So.2d 788 (La.App. 2d Cir.1990). All inquiries should be answered, "Yes." The cause in fact was Thorn's negligent treatment which aggravated Nolan's original injury. The legal cause was the relationship between inadequate staffing and equipping and Nolan's injury. Both tests have been met. See Sinitiere v. Lavergne, supra.
We hold Jefferson Downs, individually, under its rules of racing obligation is liable to Nolan for thirty percent of her damages. It is also liable vicariously for Odom's twenty percent fault.
Prior to trial Nolan settled with Edwards for $5,000.00 and dismissed her from the suit. Nolan agreed to a credit against any judgment to reflect that settlement, but neither the verdict nor the judgment evidences such a credit. Neither Jefferson Downs nor Thorn appealed on this issue, however, so we will not impose a reduction. Bustamente v. Manale, 397 So.2d 842 (La. App. 4th Cir.1981).
DAMAGES
The jury awarded Nolan $50,000.00 for her past, present, and future pain and suffering; $50,000.00 for her mental pain and anguish; $240,000.00 for loss of past earnings; and $420,000.00 for loss of future earnings and earning capacity. Medical expenses were not an issue, and only the assessment of economic losses has been appealed.
Nolan rode her first race as a jockey in 1974. In 1976, the first year of her apprenticeship, she won over sixty races. In 1977 she got an agent and was breaking and setting records. At this point she was in the top ten and was the first successful female jockey at Jefferson Downs. She beat Randy Romero on a fairly regular basis, and Romero is now one of the top jockeys in the country. She was recognized as outstanding female athlete in Louisiana and named to the Sugar Bowl Hall of *840 Fame in 1979. She stopped racing at the beginning of 1980 to get married and moved to Arizona. When her marriage didn't work out, she returned to Louisiana and took up her career in the summer of 1982, shortly before her injury.
Several jockeys testified that Nolan was a good rider and an up and comer. Jockeys can make between $15,000.00 and $100,000.00 a year. A champion jockey can earn $1,000,000.00 a year. Jockeys can ride into their forties and fifties so long as they are not injured and keep their weight down. The jockeys who testified noted the need for good vision.
The doctors testified that Nolan still complains of pain, flashers, light sensitivity, and headaches. Since Nolan is right-eye dominant, injury to this eye is more serious, since the brain receives its messages from the eye. They agreed that she could no longer do competitive horse racing. One doctor testified that a fluorescein angiogram of her eye performed in April of 1989 indicates the eye injury continues to be active and could cause further loss of vision. He said, "I think it is more likely than not that over the course of her entire life time that she will have a progressive decrease in her central vision in the right eye." He concluded that it was likely the vision in her right eye would ultimately decrease to legal blindness, 20/200.
Cornelius Gorman, E.D., an expert in vocational rehabilitation and evaluation, did a diagnostic vocational evaluation of Nolan and found her to be bright, with some education, motivated and determined. She is not likely to obtain her employment goals, considering her disability, in western St. Tammany Parish where she lives. He limited his evaluation to this area, since he felt her vision problems would prevent her from driving long distances to work. Jobs in St. Tammany pay up to $5.25 an hour with the norm between $3.85 and $4.25 an hour. He noted that Nolan was classified as handicapped by the state. She was presently working at the district attorney's office in St. Tammany making about $200.00 a week. Jockeys, on the other hand, make on the average $35,000.00 to $65,000.00 annually if they are up and comers. Nolan's present goal is to be a respiratory therapist, which he considered a reasonable goal. She was in her preliminary course work and told him that the pain in her eyes sometimes made a problem studying. However, he thought she probably would not make it into the respiratory therapy program and he noted that she was presently having problems with the course work. He found work available for her in both St. Tammany and Jefferson Parishes, but she already had a job at the district attorney's office. She would gross a little more than $8,000.00 annually in a minimum wage job and was making about $9,600.00 annually as an exercise rider in 1988. He didn't think she should work around horses.
Cindy Harris, a certified rehabilitation counselor with a master's degree, also testified that she had evaluated Nolan. She found Nolan had aptitudes for many jobs and several career alternatives. These jobs would be found all over the country including western St. Tammany Parish. The average weekly wages for some of these jobs are as high as $506.00. She found Nolan to be employable, highly motivated, and capable of employment at some of these occupations, although she thought Nolan's earning capacity would be enhanced when she completes her training. Once she completes her training, work in a medical-science-related field could pay in the upper twenties to mid-thirties. How long that would take depends on her progress in school. She could also do general office work and bookkeeping without additional training and make $242.00 or $283.00 per week. Harris contacted the Jockey Guild and learned that the average career of a jockey was seven years and the average wage for a jockey is approximately $25,000.00 annually. Two factors would contribute to the short average career: injuries and growing out of the weight limitation.
Mel Wolfson, Ph.D. testified as an expert economist. He based his conclusions on a work life expectancy of twenty-six years and earning capacity of $35,000.00 annually. Adjusting for average investment rate, *841 discount, and average long term wage increases, he concluded Nolan's past earnings loss to be $265,424.00. This figure had not been decreased by any actual earnings Nolan may have had. Using these same adjustments, and subtracting $200.00 per week, he calculated her future economic loss as $507,105.00. He had not been shown Nolan's tax returns but based his conclusions on information obtained from her attorney. Her 1979 tax return shows income of $29,640.00; and he was told she received an additional $5,000.00 which had been placed in escrow by Jefferson Downs. He did not take into consideration any deductions from Schedule C, profit and loss from business or profession.
Dan M. Cliffe, a CPA, also testified as an expert economist. In his analysis, he deducted Nolan's business expenses from Schedule C. He found her work life expectancy 23.17 years and her average annual income base $3,979.00. He concluded, based upon Harris' conclusions about the jobs and income Nolan might anticipate, that she had no future economic loss. Even based upon minimum wage jobs, he believed she had no economic loss. He was not aware of and did not take into consideration the awards Nolan had won. He calculated her past loss as $15,925.00, before taxes. These calculations were based upon a projected income of $8.75 per hour, or $350.00 per week, although he didn't know of any job Nolan has had where she has made that much.
We believe the evidence as a whole supports an award of economic damages. The law in this circuit is that economic loss should be calculated on gross wages. Riley v. Winn-Dixie Louisiana, Inc., 489 So.2d 931 (La.App.1986), writ denied 494 So.2d 329 (La.1986); Holmes v. Texaco, Inc., 422 So.2d 1302 (La.App.1982). We do not intend to deviate from that rule. However, where the plaintiff is not a wage earner but is a self-employed business person who has considerable expenses involved in producing that income, such as supplies, fees, commissions, employee costs and the like, a clarification of the meaning of the term "gross" is needed.
The First Circuit, in calculating a commission salesman's lost earnings, ruled that the use of net taxable income to determine loss of earnings where the plaintiff has a business with expenses which are "obviously deductible from gross income [from Schedule C] ..." was proper. Preston v. Chrysler Motor(s) Corporation, 334 So.2d 486, 488 (La.App.1976), writ denied 337 So.2d 877 (La.1976). We believe that, for the purpose of calculating Nolan's income loss from the date of her injury until the trial, the appropriate measure of her "gross" earnings as a self-employed businesswoman is the "bottom line" of Schedule C, or the net profit from business [line 29], which is entered on line 12 of Form 1040.
Nolan's net profit in 1979, her best pre-accident year, was $6,207.00. We increase that figure by the $5,000.00 placed in escrow for her for an annual economic loss of $11,207.00. This must be reduced by her actual earnings of $13,232.63 during this seven-and-a-half year period, resulting in past lost income of $70,820.02. We modify the award for this element of damages and reduce it accordingly.
The testimony establishes such a wide range of possible income capacity for jockeys that the choice of $35,000.00 to represent Nolan's earning capacity in the future is not an unreasonable one. While she may not yet have earned $35,000.00 annually on a regular basis, the evidence supports a finding that this was her probable earning capacity. Earning capacity is not necessarily determined by what Nolan has earned in the past; it is based on what she could have earned in the future. Folse v. Fakouri, 371 So.2d 1120 (La.1979). However, we must reduce this award in like proportion to reflect her anticipated Schedule C expenses. We therefore reduce the award for loss of future income and earning capacity to $123,900.00.
We hold that John Thorn, M.D. was negligent in his treatment of Sharon E. Nolan and that his negligence was a cause in fact of Nolan's damages. His proportion of liability is fifty percent. We hold that Jefferson Downs, Inc., as Charles Odom, *842 M.D.'s employer, is liable to the extent of twenty percent of Nolan's damages. Additionally, we hold Jefferson Downs individually liable for its violation of Rule of Racing Sec. 35:57 in the amount of thirty percent. We therefore render judgment in favor of Sharon E. Nolan in the amount of $50,000.00 for past, present, and future pain and suffering; $50,000.00 for mental pain and anguish; $70,820.02 for loss of past earnings; and $123,900.00 for loss of future earnings and earning capacity. The total award is $294,720.02.
AFFIRMED IN PART, REVERSED IN PART, MODIFIED IN PART, AND RENDERED.
KLIEBERT, J., concurs with written reasons.
GAUDIN, J., dissents with written reasons.
KLIEBERT, Judge, concurring.
Although I concur in the results reached by the majority opinion, I do not agree with the majority view that Jefferson Downs is vicariously liable for the acts of Odom, Thorn, and Edwards. However, I agree with the majority view that: (1) the plaintiff was free of negligence, and (2) Jefferson Downs violated the Rule of Racing Section 35:37, promulgated under the authority of LA.R.S. 4:4. This rule required Jefferson Downs ".... to provide, equip and operate an adequate first aid room" and to provide "a licensed physician" during racing hours. As stated by the majority, Jefferson Downs failed to comply with these obligations. Therefore, I believe it is liable. Moreover, I agree with the majority's total damage assessment of $294,720.02.
GAUDIN, Judge, dissenting with reasons.
I respectfully dissent, being of the opinion (1) that Sharon Nolan was at least contributory negligent and (2) that Jefferson Downs, Inc. was not liable either vicariously or because it violated any statute or racing rule.
When Nolan was struck in the eye, practically all if not all of the injury was inflicted at that point in time. The retina had been detached. Medical evidence regarding aggravation was speculative.
According to the uncontested testimony of other jockeys, Nolan was not negligent in not wearing protective goggles while exercising a horse the morning of October 1, 1982. She did, however, contribute to her injury by appearing before Dr. John Thorn in the first aid station that evening in riding attire, prepared to race. She had mounts in three races. If Nolan's eyesight was blurred, as she said it was, or if she felt unable to ride for any other reason, she did not make such a statement to either Dr. Thorn or the duty nurse. Dressed as she was, she obviously did not give the impression that she was incapacitated. She rode in all three races, apparently without incident, winning one of the races; and the next night (October 2nd), she rode again in a Jefferson Downs race.
Dr. Thorn testified that he examined Nolan's eye the evening of October 1st with an otoscope and did not find any foreign substances. Because she had no complaints or no symptoms, Dr. Thorn said, he didn't order her not to ride. He did, however, recommend that she see an ophthalmologist, repeating what the duty nurse had suggested earlier in the day.
Nolan was not a playground or even a high school or college athlete. She was a well trained, highly skilled professional athlete who rode racehorses for a living. She went before Dr. Thorn after having had mud tossed in her eye. She had no complaint or symptoms which would have justified an order for her not to ride. She was anxious to ride, dressed to ride and she did ride.
Regarding Jefferson Down's responsibility, the record shows that the racetrack hired Dr. Charles Odom, who was also the track physician at the Fair Grounds in New Orleans. Dr. Odom in turn retained Dr. Thorn to man the first aid station. While Dr. Thorn's license had been suspended for six months in 1977, he had been reinstated in 1978 with this restriction: he couldn't *843 prescribe controlled drugs. This restriction, according to the testimony, did not prevent him from adequately performing his duties at the first aid station under Dr. Odom's overall supervision.
Jefferson Downs' general manager, Brian Krantz, testified that Dr. Thorn had seen "thousands and thousands of patients" without incident. When Dr. Odom died, the Jockey Guild voted to retain Dr. Thorn as track physician. Krantz said that he did not know of Dr. Thorn's restriction when he (Thorn) was hired by Dr. Odom. In any event, a violation of a statute or racing rule is negligence per se only if it is a cause of injury, which is not the case here. There is no statute or racing rule requiring a racetrack first aid room to have sophisticated equipment with which to detect a detached retina.
Dr. Thorn's alleged negligence is that he failed to prevent Nolan from riding on October 1 and 2. Considering the circumstances, there was no negligence. Regardless, Nolan contributed at least substantially to whatever aggravation there was of her runaway horse-caused injury.