BARRY, Judge.
Mary Lewis, a 38 year old female, was enrolled in a job training program at Collier Vo-Tech School. On November 26, 1980 she returned from lunch during a heavy rain and slipped inside a side entrance to the school. Lewis filed suit for damages against the State based on negligence and strict liability.
The case was referred to a commissioner who recommended a $100,000.00 judgment, plus medicals of $8,023.56, expert fees and costs. The district court overruled exceptions to the commissioner’s report and rendered judgment.
The State basically urges that it was not negligent or strictly liable and alternatively that Lewis was comparatively negligent.
Whether the State is negligent requires a factual consideration of the risk involved and the reasonableness of the measures to prevent it. Sansonni v. Jefferson Parish School Board, 344 So.2d 42 (La.App. 4th Cir.1977), writ denied 346 So.2d 209 (La. 1977).
David Jones, a former janitor/custodian for Collier Vo-Tech, was on duty the day of the accident. He found water on the floor that morning and mopped it, but did not mop immediately prior to the accident. He testified that his duties included keeping the building “presentable” when it rains. He said when the floor was wet he usually put a sign “Use Main Entrance” at the side entrance because there were not enough “Wet Floor” signs. On the day of the accident he had not done so. He also usually removed the floor mat when it got wet.
Jones stated that the roof at the side entrance had a history of water seepage. He explained the leaks occurred at the side and main entrances after the building was redone and an addition made. He informed Leroy Kendrick, school director, of the problem and there had been attempts to fix the leak(s) which occurred every time it rained.
Linda Eubanks, a counselor at Collier Vo-Tech and a former classmate of Lewis’, testified she did not see the accident and was speaking to Dorothy Wilson at the time. Eubanks said Wilson was not with Lewis when she slipped. Eubanks claimed there had never been a problem with water “coming into the door” or with roof leaks near the door.
Dorothy Wilson, a teacher in Lewis’ program and not a State employee, testified that the accident occurred on a very rainy day. She and eight or ten people, including Lewis, had just returned from lunch. There was water on the floor because people were “coming in and out” and no warning sign. She said Lewis had used a cane since joining her class three months earlier and was using it on the day of the accident.
Wilson stated that because it was wet and Lewis could not walk fast, they walked slowly along the outside covered walkway. As she entered the door Lewis took one or two steps and her “feet went from under her, it appeared.” According to Wilson, “we stood her up”, walked her to the cafeteria, and Leroy Kendrick handled the matter. Wilson assumed the accident brought Eubanks out of her office. She denied speaking to Eubanks prior to the fall.
Willestine Davis, a friend of Lewis and a student at the school, testified that Lewis always used her cane, never ran or rushed, and was not known to slip. Davis said that on the day of the fall Wilson accompanied Davis and Lewis back from lunch. Davis opened the school’s door and Lewis entered. As Davis closed the door Lewis took “one, two, maybe three steps” and slipped. Davis and Wilson tried to break her fall. Davis stated she did not see water on the floor until she tried to get Lewis up and there were no warning signs at the side entrance.
Leroy Kendrick testified that he was unaware of an accident on November 26,1980 *486 or any water leak in the building. He stated he did not know Lewis.
Cedric Davis and Virginia Stephens, instructors at the school, testified that they did not know the door entrance had a leak. Davis, a welding instructor, stated he would normally be contacted to make repairs that could be made by his department. Stephens stated she walked through the side entrance about five times a day and never saw water on the floor, even when it rained.
Estella Lain, assistant school director, testified her duties included the repair of leaks and she was “in charge that afternoon.” She said there was no leak above the door and no rainy day procedure, except that custodians should check for water on the floor. She acknowledged water could have been tracked inside. She stated it was reasonable to expect custodians to be stationed by the doors to mop up water and there should have been a mat outside the door. She noted the school had “Wet Floor” signs and the floors were waxed about twice a month and buffed to a very shiny surface.
Two experts conducted tests to determine the coefficient of friction at the en-tranceway.
Gordon Goldman, plaintiffs expert, used tests which were conducted four years after the accident. Using a Brungraeber testing device, Goldman got an average static co-efficient of .32 dry and .28 with a thin film of water. Goldman testified that the Federal Trade Commission recommends a static co-efficient of .50 or greater and a dynamic co-efficient of .40 or greater for a floor to be considered safe. Using his findings and Pappas’ report, he concluded the floor was inherently dangerous.
George Pappas’ report, submitted by the defense and introduced by stipulation, states that Lewis’ expert did not use the proper machine. His report was based on tests conducted seven years after' the accident. Pappas used a Brungraeber testing device and concluded the average co-efficient on a dry floor was .71. A “ASTM Technical Products Model 80” found the average co-efficient was .59. Pappas did not consider either test to be valid on a wet floor. Using an NBS Sigler Pendulum Slipperiness Tester, Pappas found an average dynamic co-efficient of .34 on a dry floor and .20 on a wet floor. All the tests were performed with leather heels.
Pappas’ report states that when a slip is involved the dynamic co-efficient is the most important characteristic because it considers motion. The report concludes that the floor was not unreasonably dangerous or defective.
Mary Lewis testified that she used a cane and wore “desert boots” with a “grip sole”. She described the weather as “stormy” when she returned from lunch. She walked under the covered walkway to the side door, took a “couple” of steps, her left leg slipped, she fell on her back and hit her head on the wall. She said she was not running.
Lewis testified she did not know water was on the floor until she tried to get up and put her hand in water. Lewis said there was no warning sign at the entrance and the floor mat had been removed.
Lewis claims that after the accident she spoke to Eubanks and was taken to the cafeteria where Kendrick asked if she wanted to go to the hospital. Lewis said Kendrick authorized payment for her medical expenses.
The State claims it was not negligent, rather, Lewis “had been running down a 40 foot long and 10 foot wide covered breezeway adjacent to the building” and
[N]o proof was presented whatsoever that water was actually present or actually was the cause of the alleged slip and fall, nor at trial was there no [sic] proof that the roof leaked.
Dot Wilson, Willestine Davis and Lewis testified that Lewis was not running and slipped in water inside the door. Lewis’ use of a cane and her physical condition tends to support their assertions.
The State relies on a deposition to impeach Lewis wherein she states they were “running in from the rain.” At trial she explained that she had not run since 1976, *487 was on Percodan at the time of the deposition, and used “running” as slang.
The State also urges Lewis was comparatively negligent because she has a tendency to fall and sustained “injury after injury.” In September, 1977 she collected $102,-087.13 and in September, 1978 received $22,000.00 as a result of accidents. The State alleges that:
[O]n about November 19, 1980, Mary Lewis is admitted into St. Charles General Hospital on a stretcher and delivered by ambulance as a result of an incident where her legs give out and allowed yet another slip and fall at her home.
Lewis recounted her injuries prior to this accident. In high school she tore ligaments in her left knee while playing baseball. The injury was repaired in 1967 and she fully recovered.
Around 1969-70 Lewis was employed by Atlanta Envelope when the tip of her right index finger was severed in a motor pulley. Lewis did not file suit and received “about twelve, thirteen hundred dollars.”
Lewis was in an automobile accident (no date specified) in which her leg hit the window handle. She saw a doctor “once or twice”, was not disabled and received a settlement of a “couple of thousand.”
Lewis stated she had a hernia repair (apparently in the early 1970’s).
In 1973 while Lewis was employed by Gulf Coast Contact Lens she was taken to the hospital suffering from chest pains. She awoke with her right leg in a cast and was never told why she received treatment to her leg. She received no money and Gulf Coast’s insurer paid the medical expenses.
In March 1977, while at Gulf Coast, Lewis’ stool “rolled from under [her]”. She fell backward on a workbench, her leg got caught on the stool and she sustained injuries to her back and right leg. Dr. Manale performed surgery on the ligaments and cartilage and shaved the kneecap. She started using a back corset and cane, prescribed by Dr. Manale, if her right leg felt weak. Six months after the accident she had a laminectomy and a disc was removed. Lewis received $33,000, did not return to work, and was under Dr. Manale’s care at the time of this accident.
In 1979 Lewis’ car was side-swiped by a truck and she described her injury:
I had had surgery a few months before the accident happened, ... I had slammed on the brakes when he hit my car. That kind of pulled the muscle in my back or the nerves.
She did not remember the amount of the settlement, but said the maximum she received was $3,000.
Finally, she testified she was in a rear-end collision around August, 1986 but sustained no injuries. Under cross-examination she stated she had nerve blocks (no date specified) and was admitted to Touro but did not know the dates. She stated she complained of her right leg “giving way,” explaining that meant “feeling weak” and denied that she had ever fallen. She admitted that in 1978 she was classified “disabled” by the Social Security Administration. No explanation as to the basis of that classification was made.
Dr. Bernard Manale, Lewis’ former treating physician, testified that his notes from Lewis’ September 3, 1980 visit indicate she had three or four falls.
Regarding the State’s contention that Lewis had a tendency to fall, the only evidence supporting that allegation is the September 3, 1980 entry in Dr. Manale’s notes.
The trier of fact could reasonably have concluded that Dr. Manale’s notes reflect his interpretation Of Lewis’ complaints of her leg “giving way.”
As to the State’s allegation that Lewis previously recovered $102,087.13 due to the stool accident at Gulf Coast, the record indicates she received $33,000. There is no support to the State’s assertion that Lewis received $22,000 in September, 1977.
The State alleges that Lewis fell on November 9, 1980 and was admitted to St. Charles General Hospital. Lewis’ January, 1981 admission to the hospital shows her last admission was August 1, 1980.
We find sufficient evidence to support the trial court’s findings of negligence and *488 strict liability and that Lewis was not comparatively negligent.
The State urges that no damages should be awarded because Lewis was previously found totally and permanently disabled by her treating physician and Social Security and, alternatively, that the $100,-000.00 award is excessive. Medical expenses are not disputed.
Lewis described herself as diabetic with a heart condition, ulcer and four hernias. Prior to the fall she was on daily pain medication and had improved.
Lewis said after the fall her head hurt immediately. Two days later she went to Dr. Manale who had previously treated her and was placed in traction and had a myelo-gram. She claims that too much weight was used for the traction and the lining of her groin was tom.
Thereafter she was in and out of the hospital for “a couple of years.” She had a second myelogram which showed pinched nerves in the neck. Surgery was performed on her left leg because of pain and her back worsened. She claims no prior problem with her left leg. She also alleged the subject fall injured her neck, arm and hand, but the hand only hurt for a few days and she never received treatment for her neck or hand. In her earlier deposition she did not mention her arm. There was no other evidence regarding injury to her arm. Despite her claim that she never received treatment to her hand, she claims to have declined surgery on her neck, though it was suggested by Dr. Manale to relieve the pressure from the pinched nerves.
Lewis testified that she stopped seeing Dr. Manale when Medicare expired and the State refused to pay. She stated Social Security benefits were terminated in January 1981 while she had a cast and stitches on her leg and she did not have money for food until October, 1981.
Lewis went to Dr. Wesley Fernandez for stomach pain and he performed hernia surgery.
Lewis testified that in 1984 she saw Dr. Thomas Whitecloud because he accepted Medicare. Dr. Whitecloud did “extensive” tests and x-rays because of pain in the spine and legs. She complained of a constant ache and numbness in the left side of her leg. Dr. Whitecloud performed surgery on her lower spine in December 1984, after which she regained feeling on the left side of her leg, but she still had pain. She stated that although she was in pain prior to the fall, it was not the daily pain she now suffers. She describes the pain as “just murder.” Lewis was on pain medication prior to the fall and continued to use it.
She testified she worked while on pain medication. She cannot bend, lift or sit very long. She needs help getting groceries and describes herself as “existing” and bitter, with no hope for employment. She stated that she had no social life though she started to develop one prior to the fall.
Lewis testified that she held several jobs locally and in Michigan which paid minimum wage, but had not been employed for approximately five years prior to the accident. She completed the 11th school grade.
At the time of the accident she was in a job training program which paid $4.50 per hour. After completing the course she allegedly would have become a housing counselor at $6.50 per hour.
Dr. Manale, orthopedic surgeon, testified he first saw Lewis on January 18,1977 for right knee pain. Lewis reinjured the knee on March 1, 1977 at Gulf Coast Optical. Dr. Manale performed surgery .on March 22, 1977 for a torn meniscus and said:
She had arthritis under the patella, which I shaved, and also, I rearranged some of the muscles around the kneecap.
On June 30, 1977 he performed a lami-nectomy and on October 22, 1979 he performed a fusion, both procedures at L5-S1. The fusion was partially due to complaints of pain radiating down both legs.
After the October surgery, Dr. Manale said Lewis was doing well until she rein-jured her back in an auto accident on December 19, 1979. She was hospitalized for two weeks of observation and again in Jan *489 uary 1980, at which time her condition improved.
Lewis was seen in February, 1980 for other medical problems and in April, 1980 she complained of weakness and chest pains for which she was admitted to the hospital at least three times. The diagnosis was a potassium deficiency.
In August, 1980 she was hospitalized for one week because “something snapped in her back.” She claimed pain on September 10, and October 22, as well as numbness and tingling in her back which radiated to the right thigh.
Dr. Manale performed a neurological examination which showed no weakness, normal reflexes, but pain down the leg during straight lifts. On November 14, 1980 Dr. Manale injected the right knee. He noted nothing regarding the back.
Dr. Manale said Lewis was doing well until the auto accident in December, 1979. He considered her 100% disabled because she could not perform her job at Gulf Coast Optical, especially because of the medication.
When asked if he could foresee a time when Lewis could return to work, Dr. Ma-nale responded:
I don’t know. It depends on what she was doing. It would depend on what kind of work you are talking about ... possibly then.
Dr. Manale testified that he examined Lewis on November 28, 1980, two days after the accident and that treatment was authorized by the school. At that time she had reinjured her back, hurt her right knee, left knee, and shoulder. Her left hand was numb. His examination revealed a slight amount of fluid in her left knee and diminished sensation in her left hand.
According to Manale, Lewis continued to have pain in both knees but the left apparently became worse. A subsequent x-ray of the left knee revealed arthritis on the medial side, inside of the joint, which:
[Ljooked really bad. It was destroyed. It was irregular.
Lewis had back and neck pain. Dr. Ma-nale treated her with a pillow and physical therapy in December 1980. In January 1981, he performed an osteotomy of Lewis’ tibia. He explained that this involved cutting a slice of bone out to keep her leg to keep it from turning in and reduce the pain. On January 23, 1981 she had a myelogram of the neck and lumbar region which showed a mild amount of spondylosis arthritis at levels C5-6, C4-5, and C6-7. Dr. Manale testified that condition can cause pain and, if it persists and is severe, a cervical fusion is recommended. He noted Lewis had no prior neck or shoulder pain complaints.
Dr. Manale continued treating Lewis throughout 1981 into 1982. In May 1981 she had intermittent pain in her neck and back. Because of tenderness in the area where the staple was used to hold her bones together, the staple was removed in October 1981. Cortisone injections were used “a few times” because of continued problems.
In a May 12, 1981 report, Dr. Manale noted a residual physical impairment of the knee of approximately 20% and that the staple was still in place. Which knee is not specified. He noted only 95 degrees flex-ion in the knees, making her unsuitable for strenuous or prolonged walking or standing. He estimated approximately 20% physical impairment because of residual disability in the lumbar spine. The report concluded that Lewis was not suitable for employment because of her physical restrictions and because of the possibility of impaired judgment due to the narcotic medication. Dr. Manale said his strong statements regarding her disability were made to assist Lewis in her attempt to obtain disability benefits.
The November 14,1980 report, just prior to the accident, stated:
Mary Lewis has been under the care of this office for several years. She has a chronic back syndrome and has had surgery with fusion of her lumbar spine. She has intermittent episodes of pain at times which are incapacitating, causing her to lose time from work and class on an unpredictable and irregular basis.
*490 His July 18, 1980 report notes the possibility of her obtaining a job and he encouraged her to do so.
Dr. Manale testified that Lewis’ condition had worsened by the 1980 fall. In particular, he noted that there were no prior left knee complaints until the fall, at which time it required surgery. He felt that her lumbar spine problems were aggravated by the 1980 fall though the permanent disability was caused mostly by events prior to 1980.
Dr. Manale discontinued treatment in 1982 because Lewis owed him a substantial amount of money.
Under cross-examination, Dr. Manale testified that in August 1977 and November 1977 Lewis reported pain radiating down both lower extremities because of back injury.
Dr. Manale explained his use of the term “permanently disabled” as meaning a disability from strenuous physical activities. He acknowledged that his notes from her visit on October 22, 1980 indicated she was having problems with her left leg but explained that it was due to the sciatic nerve, not the knee.
Dr. Manale did not dispute that he urged Lewis to participate in the CETA training program. He explained that though he could not remember specifically doing so, he always encouraged patients to take advantage of opportunities for training which would enable them to return to work.
A report by Dr. Dorsey Dysart and dated December 2, 1977 was introduced by the State. It noted that either of Lewis’ legs “occasionally gave way when walking.”
Dr. Thomas Whitecloud, an orthopedic surgery expert, was Lewis’ treating physician at the time of trial. Dr. Whitecloud first saw Lewis on September 21,1984. At that time he felt she had a permanent physical impairment of 30% of her body and was unemployable. A CAT scan was performed and showed some “lateral recess stenosis or bony impingement at the L4-5 level in her lower spine.”
In December 1984 he operated, decompressing the L4-5 and L5-S1 levels and removed the impinging structures to relieve chronic leg pain. The February 1985 visit indicated her condition was improving but the April 1985 visit indicated her symptoms had returned to previous levels. He recommended that she not lift anything greater than ten pounds, nor do prolonged sitting, stooping, bending, climbing or lifting and felt she would be restricted by her pain level. He concluded she was not employable now nor was there any expectation of employability in the future.
Under cross-examination, Dr. Whitecloud stated Lewis had told him at the first visit that she had not seen a doctor for about three years because she had no money. He acknowledged she had an accident in 1986 in which Lewis allegedly hurt her back.
Dr. David Akin, the State’s expert in occupational medicine and general surgery, saw Lewis on May 17, 1982 and September 22, 1986. He did not review any of Lewis’ medical records. Dr. Akin testified Lewis complained on the first visit of pain in her neck, going down her left arm into her hand, pain and weakness in her left knee and pain in her low back. Her blood pressure was high, her pulse a little rapid and she was overweight. He did not perform detailed physical examinations of her neck, her neurological status and her low back. Regarding her left knee he noted
[Considerable crepitus on motion testing ... some limitation of flexion, and also weakness of the left quadriceps muscle. And there was some tenderness generally about the left knee.
He found she was impaired due to reliance on narcotics. He could not quantify or qualify her degree of impairment but felt her left knee was the most significant impairment, though he said she had “plenty of trouble” in both areas. He noted Lewis thought her neck and left upper extremity problems were more significant.
Dr. Akin thought Lewis was a candidate for further treatment, including surgery, so that no permanent impairment figure was appropriate. He did not consider Lewis 100% physically impaired. He noted her June 1985 low back surgery as well as *491 hernia and abdominal surgeries in 1983 and 1984.
On the second visit he noted left knee and low back pain and her neck had improved to the point of being intermittent. She had no complaint of pain going down her left arm, but her hands were numb at times. He found she had minimal neck tenderness, her left knee was in bad condition and her low back was the main complaint.
Dr. Akin concluded Lewis was 15-20% impaired because of her back and another 15% for her knee. He did not consider disability due to the addiction.
Despite the conflicting testimony pertaining to the accident, and the difficulty of isolating which injuries resulted, we are guided by the much discretion of the trial judge.
Quantum should not be disturbed absent abuse of the trial court’s much discretion. Reck v. Stevens, 373 So.2d 498 (La.1979). We find no abuse of discretion.
AFFIRMED.