613 So.2d 286 (1993)
Theresa Montalbano, Wife of/and Erhard THUMFART
v.
Ronald J. LOMBARD, State Farm Insurance Company and Water Board of New Orleans and/or City of New Orleans.
No. 91-CA-2602.
Court of Appeal of Louisiana, Fourth Circuit.
January 21, 1993.
Rehearing Denied March 10, 1993.
Writ Denied May 21, 1993.
*287 John F. Tooley, Jr., Woodlands, and Kevin A. Rieth, Gretna, for plaintiffs/appellants.
Marianne S. Pensa, Galloway, Johnson, Tompkins & Burr, New Orleans, for defendants/appellees.
Before KLEES, BYRNES, ARMSTRONG, PLOTKIN and WALTZER, JJ.
WALTZER, Judge.
This appeal comes from a trial court judgment dismissing plaintiff's claims against defendants Ronald Lombard and the Sewerage and Water Board of New Orleans. In his reasons for judgment, the trial judge stated that Theresa Thumfart, plaintiff, failed to establish by a preponderance of the evidence whether the uncovered hole causing her injuries was the hole located on Mr. Lombard's property or the Sewerage and Water Board's meter box hole, which was on city property. After a trial on the merits, the trial judge dismissed plaintiff's claims against Mr. Lombard and the Water Board.[1] The trial judge never reached the issue of damages. Plaintiff now appeals the trial court's judgment, claiming both liability and damages.
This action arose from an accident involving an uncovered hole in a parking lot on November 27, 1988. On that date, Theresa Thumfart drove to a lounge known as Chasers at 5771 Crowder Boulevard. Chaser's Lounge is one part of a building owned by Ronald Lombard. The other part of the building contains a pawn shop. In front of the building, in the parking lot, is a snowball stand. On the evening of November 27, 1988, Mrs. Thumfart parked her car in front of the snowball stand. She walked across the parking lot, entered the bar, had one drink, and left. As she was walking *288 back to her car, Mrs. Thumfart failed to notice an uncovered hole, which could have been either one foot or four inches deep.[2] Her foot fell into the hole and her arm and upper body hit the pavement, causing several sprains, bruises, and other injuries. Plaintiff then made her way back to the lounge and told the owner what had happened. The owner went out to the parking lot to examine the area, saw the uncovered water meter hole, and immediately called the Sewerage and Water Board of New Orleans, who then sent someone to replace the cover that night. Mrs. Thumfart then went to Methodist Hospital's emergency room where she was treated. She was later treated by several other physicians.
Mr. Lombard had purchased the lot at 5771 Crowder Boulevard in 1976. At that time, the lot was undeveloped grassland. In 1976, Mr. Lombard built a building which he now leases to Chaser's Lounge and a pawn shop. In 1977, he constructed a separate snowball stand on the lot. In addition to the building and the snowball stand, Mr. Lombard paved the rest of his property as a parking lot and driveway. While he initially paved only his property, he later got a permit and servitude to pave over city property which separated a portion of his land from Crowder Boulevard, and which Mr. Lombard used to extend his parking lot and create another entrance to his property. An imaginary line thus runs through the parking lot separating Mr. Lombard's property from the City's. On Mr. Lombard's side of the property line is a hole for sewerage drainage and cleanout, which he built and was required to have in accordance with city regulations. On the City's side of the property line, close to the other hole, is a water meter hole wherein the Sewerage and Water Board reads the meter in order to determine Mr. Lombard's water bill. The attorney for Mrs. Thumfart argued before this Court that Mr. Lombard constructed the water meter hole when he developed the city property on which it is located. The attorney for Mr. Lombard denied this allegation, claiming that the water meter hole existed prior to Mr. Lombard's development of the property. The deposition testimony of Warren Lawrence of the Sewerage and Water Board indicates that the water meter box existed prior to Mr. Lombard's development of the property.
The trial judge found it difficult to determine which hole Mrs. Thumfart fell into. Because there were no witnesses to the incident, only Mrs. Thumfart could give direct testimony as to which hole caused her injuries. At trial she stated that Mr. Lombard's drainage cleanout hole caused her fall. She also introduced photographs, taken the day after the accident, indicating the hole on Mr. Lombard's property as the cause. Defendant's witnesses were found equally credible as they identified the Sewerage and Water Board's water meter hole as the one fallen into by plaintiff. The owner of the lounge and an employee of the Sewerage and Water Board both testified that there was a missing cover to the water meter hole on the evening of the accident. The trial judge, having found the plaintiff and defendant's witnesses equally credible, stated in his reasons for judgment that neither party proved by a preponderance of the evidence which hole caused Mrs. Thumfart's fall.
After a full trial on the merits, the trial judge ruled that (1) although strict liability applied, and the uncovered hole (whichever one actually caused the plaintiff's injuries) constituted a defect, because Mrs. Thumfart could not prove by a preponderance of the evidence that the hole she fell into was located on Mr. Lombard's property, her claim against Mr. Lombard must be dismissed,[3] and (2) that if the hole causing her *289 injuries was the Sewerage and Water Board's water meter hole, then plaintiff failed to prove by a preponderance of the evidence that the Sewerage and Water Board had actual or constructive notice of the missing cover.[4] Moreover, because the trial judge did not affirmatively answer the issue of liability, he found no need to answer the question of damages. The trial judge did, however, apportion one third of the fault to Mrs. Thumfart, pointing to the fact that she had one drink and was walking through a dark parking lot inattentively. Mrs. Thumfart now appeals the trial court's judgment, arguing that her claim against Mr. Lombard was improperly dismissed and that damages should be awarded.
The plaintiff's claim against Mr. Lombard is based upon La.Civil Code article 2317. That article states:
We are responsible not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable or of the things which we have in our custody. This is to be understood with the following modifications. (emphasis added)
In order to prove liability under article 2317, the plaintiff must prove that (1) a defect posing an unreasonable risk of harm to persons exercising ordinary care, (2) which was in the custody of the defendant, (3) caused her injuries. Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106 (La.1990). The trial judge, in his reasons for judgment, found that the uncovered hole (whichever one) in a "somewhat dark" area of the parking lot at night posed an unreasonable risk of injury to persons exercising ordinary care and thus a defect for 2317 purposes. This Court agrees with that conclusion.[5] Furthermore, *290 there was no question in the trial court that one of the two holes caused Mrs. Thumfart's accident. The issue on appeal is whether the trial court was correct in ruling that Mr. Lombard could only be liable under 2317 for injuries resulting from the hole on his property, and not for the hole located on city property.
It is well settled law in Louisiana that strict liability under La.C.C. article 2317 is based upon the relationship between the person with custody and the thing posing an unreasonable risk of harm to others. The article imposes liability based on custody and not ownership. Ownership allows a presumption of custody. Doughty v. Insured Lloyds Ins. Co., 576 So.2d 461, 464 (La.1991). However, absence of ownership does not end the inquiry of 2317 liability. Custody, distinct from ownership, refers to a person's supervision and control (garde) over a thing posing an unreasonable risk of harm. Loescher v. Parr, 324 So.2d 441, 446 (La.1975). Under Louisiana law, the guardian is in a better position than the innocent victim to detect, evaluate, and take steps to eliminate a defect posing an unreasonable risk of harm to others. Doughty, supra at 463, 464 (citing Ross v. La Coste de Monterville, 502 So.2d 1026, 1028 (La.1987); Kent v. Gulf States Utilities Co., 418 So.2d 493, 497 n. 5 (La. 1982)). Our Louisiana Supreme Court has recently used a two part test in determining whether the defendant has custody. First, the defendant should have a right of direction and control over the thing. Second, a court should examine what, if any, kind of benefit the defendant derives from the thing. Doughty v. Insured Lloyds Ins. Co., 576 So.2d 461, 464 (La.1991); King v. Louviere, 543 So.2d 1327, 1329 (La.1989).
In the case presently before us, the trial judge dismissed plaintiff's claim against Mr. Lombard stating, "[t]he plaintiff has failed to establish by a preponderance of the evidence that it is more likely than not that she stepped into the hole for sewerage/drainage clean-out located on Lombard's property." The trial judge thus determined that strict liability could not exist for the hole located on property not owned by the defendant.[6] While ownership would have allowed a presumption of custody, the inquiry of liability does not end with a determination of nonownership. We think the trial court should have further determined whether Mr. Lombard exercised sufficient control or supervision over property with the water meter hole and whether Mr. Lombard benefited from this property.
The trial record indicates that Mr. Lombard received a significant benefit from the property with the water meter hole. Mr. Lombard leased his property and building at 5771 Crowder Blvd. to three businesses: a lounge, a pawn shop, and a snowball stand. The city property over which Mr. Lombard paved was used as an additional driveway and parking area for patrons visiting those businesses located on his property. The trial judge noted that such a benefit existed during the direct examination of Mr. Lombard.
BY MR. TOOLEY:
This is all on city property, all that front area?
BY MR. LOMBARD:
All except behind that diagonal line I drew.
BY MR. TOOLEY:
The one that's called sewer meter is on the city property from this line (indicating), but it's all concrete and drive that you built, correct?
BY MR. LOMBARD:
You have to have a driveway to get into a place of business, so we were required to put the driveway in. We wanted to put the drive only on the service *291 road. The city insisted we have, since our address was on Crowder Boulevard, we had to have a driveway entrance on Crowder. The city insisted we did.
BY MR. TOOLEY:
To have a commercial establishment you had to do that?
BY MR. LOMBARD:
That's what they said. We had an address on Crowder Road. We couldn't have an entrance on the service road. It had to be on Crowder.
BY THE COURT:
This is not leading to anything I need.
BY MR. TOOLEY:
May it please the Court, I think that the custodyI have to show that he
BY THE COURT:
He's already testified that he paved it (the portion of land with the water meter hole).
BY MR. TOOLEY:
It's for his economic benefit.
BY THE COURT:
He already testified to that.
Trial Transcript, Volume III, page 92, 93.
Because the trial court determined that a benefit to Mr. Lombard existed, the question now before us is whether Mr. Lombard also had the requisite supervision and control over the property to impose La.C.C. 2317 strict liability. We believe he did.
During the late 1970's, Mr. Lombard obtained a permit and was granted a servitude by the City to pave over the portion of land with the water meter hole. This portion of land was used as a driveway to and an extension of the parking lot for the businesses on Mr. Lombard's property. Mr. Lombard also stated that he visited either the Wendy's or Denny's adjacent to his property several times a week, and that he did a good deal of work from a window booth overlooking his property. Mr. Lombard additionally testified that he remembered seeing the Sewerage and Water Board checking the meter sometime during the week prior to Mrs. Thumfart's fall. Mr. Lombard stated that his contractor had informed him of the deteriorating condition of the pavement surrounding the drainage cleanout hole on his property, a few feet away from the water meter hole. Furthermore, he stated on direct examination that he had taken the lids off both holes on different occasions and was familiar with the insides of both. Just as these factors would support a finding that Mr. Lombard had control and custody over the parking lot on his side of the property, the same is true for the remaining part of the parking lot located on city property.[7] For these reasons, we believe that Mr. Lombard exercised sufficient control and direction, and received enough of a benefit, to have custody of the property for La.C.C. art. 2317 purposes.
This case is distinguishable from the typical sidewalk cases. The Supreme Court, this Court, as well as other Circuit Courts, have held on several occasions that an abutting property owner is not liable for injuries caused by defects located on adjoining sidewalks or streets unless the property owner did something to help create the defect. St. Paul v. Mackenroth, 246 La. 425, 165 So.2d 273 (1964); Arata v. Orleans Capitol Stores, 219 La. 1045, 55 So.2d 239 (1951); Houssiere v. Lafayette Insurance Co., 559 So.2d 903 (La.App. 4th Cir.1990); Murphy v. City of New Orleans, 537 So.2d 1183 (La.App. 4th Cir.1988); reh. den. (Feb. 16, 1988); writ den., 541 So.2d 896 (La.1989); George v. Western Auto Supply Co. Inc., 527 So.2d 428 (La.App. 4th Cir.1988); Jones v. Gillen, 504 So.2d 575 (La.App. 5th Cir.1987); reh. den. (April 16, 1987); writ den., 508 So.2d 86 (La. 1987); Simmons v. City of Lake Charles, 368 So.2d 1167 (La.App. 3 Cir.1979). We agree with the principle of law expressed by the above mentioned cases. However, *292 the case before us presents a substantially different set of facts. The abutting property owners in previous cases did not develop, benefit from, or use city property to the extent Mr. Lombard did. Furthermore, the abutting property owners in previous cases never obtained permits or servitudes from their municipalities to develop adjacent city property and adopt it as their own. In prior cases, the city property on which defects were located always remained designated for public use. The city property over which Mr. Lombard paved was not held out as a sidewalk or street for public use, but rather was developed for the exclusive and private use by patrons visiting the businesses located on his property. To suggest that the portion of the parking lot on city property was open to the public to use as they would a city street or sidewalk simply defies reality. We maintain that where an abutting landowner develops adjacent property and adopts it as his own for private, and not public, use, he may be held strictly liable for defects posing an unreasonable risk of danger located on such property.
We believe the facts and reasoning of the Second Circuit case Lowe v. Thermal Supply of Shreveport, 242 So.2d 351 (La. App.2d Cir.1970); reh. den. (Jan. 11, 1971) are analogous to the present case. In that case, the court held that a storeowner and property owner could be held liable for a customer's injuries which resulted while crossing an empty lot to get to the store. The storeowner did not own the adjacent vacant lot, but had allowed and invited customers to use it as a pathway to his business. The Second Circuit described the storeowner's duty as follows:
The occupier thus owes a duty to avoid reasonably foreseeable danger to his invitee and to keep his premises safe from hidden dangers in the nature of traps or pitfalls in that they are not known to the invitee and would not be observed and appreciated by him in the exercise of ordinary care. [citing Levert v. Travelers Indemnity Company, 140 So.2d 811, 813 (La.App. 3d Cir.1962) ] Lowe v. Thermal Supply of Shreveport, supra at 352.
In the case now before us, Mr. Lombard invited patrons of the businesses leasing his property to use the City's property by developing it as an additional entrance and parking area. Furthermore, Mr. Lombard obtained a permit and servitude from the municipality to develop, pave over, construct upon, and adopt this portion of city property as his own for private and not public use. Mr. Lombard also was either present or oversaw the property at 5771 Crowder Blvd. on a regular basis. We therefore hold that the facts in this case show that Mr. Lombard had custody of the adjoining city property, and a duty may be imposed upon him to keep the area free from defects which pose an unreasonable risk of harm.
For these reasons, we reverse the trial court's judgment and find Mr. Lombard strictly liable for the injuries sustained by Mrs. Thumfart. Damages should thus be assessed and awarded.
The proceeding from the lower court was a full trial on the merits, and this Court has before it all the evidence presented at trial regarding Mrs. Thumfart's injuries. We therefore decide to exercise our appellate jurisdiction to review the facts and accordingly assess damages without remanding. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975); Nolan v. Jefferson Downs Inc., 592 So.2d 831 (La. App. 5th Cir.1991), reh. den. (1992), writ den., 596 So.2d 558, 559 (La.1992).
The evidence in the record reveals that the plaintiff suffered numerous injuries and physical problems from prior accidents and illnesses. During the 1970's, she suffered several accidents injuring her lower back and requiring surgery. Additionally, the plaintiff had been put in traction about two years before her fall, had been diagnosed to have carpal tunnel syndrome a year prior to her fall, had been seeing a physician for lower back trouble, and had been suffering from hypertension and bowel problems consisting of colitis, gastritis, and hemorrhoids for several years prior to her accident.
*293 Four physicians were called by the plaintiff to testify about her injuries resulting from the accident. The defendant called no medical experts.
Dr. A. Cracco, an orthopedist, testified that he examined the patient on November 29, 1988, two days after the accident. Dr. Cracco stated that the plaintiff at that visit complained of a ringing in her ears, soreness at the back of her head, diarrhea, arm and neck pains, pains in her right leg and foot, and discomfort in her lower back. His examination at that time, which included a review of the X-rays from Methodist Hospital from two days before, indicated a cervical sprain at C4, 5, and 6, several abrasions and bruises, and inflammation of her pre-existing arthritis. Valpin, an anti-inflammatory drug, was prescribed, along with moist heat. The doctor also indicated that he was treating Mrs. Thumfart for a fractured toe she suffered about a month and a half before the fall, which resulted from having dropped a frozen hen on her foot. Mrs. Thumfart returned to Dr. Cracco on December 22 for a check up of her fractured toe and the injuries from her fall on November 27. She next visited the doctor on January 12, 1989, at which time she again complained of pain in her hand and right thumb, and informed the doctor that the medication earlier prescribed was upsetting her stomach. Dr. Cracco's records next indicated a phone call to his office from Mrs. Thumfart in which she stated that she again injured her toe, and wanted to know if she should tape it up herself. She did not go back to Dr. Cracco's office until March 2. On that visit she repeated her complaints about her hand and thumb, as well as pains in her knee. Dr. Cracco noted a flare up of Mrs. Thumfart's pre-existing arthritis and carpal tunnel syndrome, for which he prescribed cortisone treatments and a wrist support and recommended that she see Dr. Hedgpeth. Mrs. Thumfart did not return again until August of 1989. On that visit she complained of pain in her feet and a possible sprain in her shoulder. Dr. Cracco did not relate these later problems to the fall. However, Dr. Cracco again saw the plaintiff in September and October of 1990 for problems in her right hand related to her arthritis. In his testimony, Dr. Cracco described his medical history with the plaintiff, which began in 1979. He described that several domestic quarrels, accidents, and degenerative conditions resulted in dislocated shoulders and fingers, sprained ankles, wrists, and fingers, carpal tunnel syndrome and arthritis in her hands and right thumb, and two fractured toes.
Dr. M. Hedgpeth, an expert in rheumatology and internal medicine, began treating the plaintiff in April of 1989. She was referred by Dr. Cracco to determine the cause of the plaintiff's stiffness and pains in her shoulders, neck, elbows wrists, hips, knees, and lower back. Her diagnosis revealed rheumatoid arthritis, which she felt would have developed without the fall, but was most certainly exacerbated by the accident. While Dr. Hedgpeth stated that it was difficult to determine whether plaintiff's pains and stiffness experienced during much of 1989 was related specifically to the accident or to natural progression of rheumatoid arthritis, she did state that, more likely than not, the stiffness in the hip, knees, and ankles was related to the accident in November of 1988.
Dr. Harry Colcolough, an internist, testified that the plaintiff suffered intestinal problems during the month after the accident including serious gastritis, colitis, hemorrhoids, and explosive bowel movements. The witness attributed this to the accident, stating that the trauma of the fall, coupled with the pain medication taken by plaintiff, greatly aggravated her pre-existing condition. This witness also testified that the plaintiff returned to his office a few weeks later suffering from a urinary infection, which the physician stated was most probably not related to the fall. However, Dr. Colcolough testified that the plaintiff revisited him several times during the following months, again complaining of bowel problems and suffering from hypertension, which the witness again attributed to the accident. In September of 1990, Mrs. Thumfart was admitted into a hospital for costocongritis, an inflammation of a cartilidge in the chest wall which blocks the *294 flow of oxygen making it more difficult to breathe. The witness stated that this condition, two years after the accident, was most likely not related to the plaintiff's fall.
Dr. R. Llewellyn, a neurosurgeon, testified that he had been seeing the plaintiff for many years, and had performed lower back surgery on her in 1980 and wrist surgery in 1987. He stated that Mrs. Thumfart came to him in June of 1989 complaining of pains in her neck, shoulder, lower back, knees, legs, and foot. Dr. Llewellyn consequently ordered an MRI. He compared the MRI results from June 1989 with a MRI test he ordered in August of 1988. His conclusion was that the plaintiff suffered a new injury at C3 and C4, which explained the pains in her neck and shoulders. Dr. Llewellyn attributed this condition to the accident of November 1988. He then prescribed physical therapy consisting of various exercises which led Mrs. Thumfart to join a health clinic known as No Sweat. Dr. Llewellyn suggested that she continue wearing the orthopedic shoes which had been prescribed by Dr. Cracco for her fractured toe in 1988. Dr. Llewellyn continued seeing the plaintiff through 1989 and 1990. In August of 1990, another MRI was ordered which revealed a significant improvement at C3 and C4.
After considering the testimony described above, the trial judge reached the following conclusion with regard to Mrs. Thumfart's injuries resulting from her November, 1988 fall:
Mrs. Thumfart has an extensive medical history and the gravamen of the dispute with respect to her injuries is the extent to which the accident accelerated prior existing conditions or caused new medical conditions for her. Extensive medical tests were performed by various doctors and testing entities. Primarily, Mrs. Thumfart's injuries are acceleration and aggravation of rheumatoid arthritis; contusions; abrasions; hand injuries (irritation of borderline carpal tunnel syndrome); right knee injuries; left shoulder injuries; and further minor aggravation of a cervical bulge at C3-4.
We agree with these findings but further note the plaintiff's pain and considerable discomfort due to her aggravated bowel condition experienced during the month or so after the accident as testified to by Dr. Calcolough.
The plaintiff introduced into the record her medical expenses accumulated since her fall in November of 1988. These bills total $16,816.80.[8] However, each physician testified that a portion of their treatment was for injuries or illnesses not related to the fall. After a careful review of the record, we believe that about three-fourths (3/4) of plaintiff's physician expenses are attributable to her accident. We therefore find $12,000.00 awardable as compensation for the plaintiff's medical expenses resulting from the accident on November 27, 1988.
The plaintiff was not working nor looking for work at the time of the accident. She therefore lost no past or future wages as a result, and such damages need not be awarded.
With regard to plaintiff's general damages, our review of the record indicates that the plaintiff suffered pain and aggravation well into 1989, almost a full year after the fall. The plaintiff testified that much of her time was spent in doctor's offices, hospitals, and physical therapy clinics, and that she had great difficulty in doing some of the things she used to with her husband like long walks, tennis, and boating. However, she also testified that not too long after the accident, she and her husband took a trip to Europe and Medjugorje. Again concluding that about one-fourth of Mrs. Thumfart's pain and suffering, as well as any loss of enjoyment of life, was not attributable to the accident, we believe that $60,000.00 should be awarded in general damages. We believe this figure reasonable after a review of the *295 record and considering other awards for general damages in recent cases with similar injuries.[9]
We defer to the trial court's determination that the plaintiff was one-third at fault for the accident, and her damages should be adjusted accordingly. The plaintiff shall thus be awarded two-thirds (2/3) of the total of her medical expenses and general damages attributable to the accident.
For the foregoing reasons, the judgment of the trial court finding no liability on the part of defendant, Mr. Lombard, is reversed, and the plaintiff is hereby awarded $48,000, which is two-third (2/3) of the plaintiff's medical expenses and general damages resulting from the accident, plus legal interests and costs.
REVERSED AND RENDERED.
PLOTKIN, J., concurs with written reasons.
BYRNES, J., dissents with reasons.
ARMSTRONG, J., dissents for reasons assigned by BYRNES, J.
PLOTKIN, Judge, concurs with written reasons:
I respectfully concur in the majority decision reversing the trial court judgment and holding the defendant Ronald J. Lombard strictly liable for the injuries sustained by plaintiff Theresa Montalbano when she stepped into an uncovered Sewerage & Water Board meter hole, even if that meter hole was located on the City's property.
As the majority notes, the concept of "garde" for purposes of strict liability is not limited to property owners. Presumptively, a property owner has garde over his property. However, persons other than owners can have "garde" provided they meet two requirements: (1) they have the right of direction and control over the thing, and (2) they derive a benefit from the thing. The defendant in this case extended his garde to the adjacent city-owned property when he voluntarily improved the City's property for his own purposes.
Unquestionably, the defendant in the instant case had the right of direction and control over the parking lot and the driveway in question. This defendant sought and obtained a permit from the City, which allowed him to construct the parking lot. Essentially, the City granted him a servitude over its property when it agreed to allow him to create a method of access for his commercial establishments. When he constructed the parking lot and the attached driveway, the defendant voluntarily assumed the responsibility for maintaining, inspecting, and controlling the entire paved area. Also without doubt is the fact that the defendant derives an enormous direct economic benefit from the existence of the parking lot and driveway, since the paved area provides egress to the commercial establishments located on his property.
It seems obvious to me that the uncovered hole renders the parking lot defective in this case. The trial judge correctly found that the missing water meter cover created an unreasonable risk of harm in the *296 parking lot, not that the meter itself was defective because the cover was missing, as the dissent implies. The dissent's decision to focus on the objectthe missing water meter cover itselfis misplaced because it destroys the doctrine of strict liability, which was designed to create a presumption of liability when a defective thing causes damage to a third party. This case involves a classic application of the traditional social risk/utility analysis used consistently by Louisiana courts to determine liability. Under the civilian tradition, we should apply the principles of strict liability whenever the plaintiff has proven the three necessary elements, not search for new exceptions to the rule.
Finally, applying strict liability under the facts of this case is logical. The facts demonstrate that the Sewerage & Water Board responded immediately when notified by the owner of the lounge that the water meter cover was missing. Thus, placing the responsibility for inspecting the hole for missing cover meets the social goal of preventing and correcting defects as quickly as possible. The defendant in this case is certainly in a much better position to discover a missing meter cover than is its co-guardian, the City. Therefore, placing responsibility for the missing meter on the owner of the property is a fair burden to impose in order to fulfill societal purposes.
BYRNES, J., dissents with reasons.
I respectfully dissent. It could not be determined whether plaintiff's injury was caused by tripping in a hole on the defendant, Mr. Lombard's property or whether she tripped in a Sewerage & Water Board meter hole located on property owned by the City of New Orleans immediately adjacent to Mr. Lombard's property. Mr. Lombard leased his property to a Mr. Gilardi who operated a lounge at that time. Therefore, in order for this court to hold the defendant responsible for plaintiff's injuries it was necessary to find that the defendant was somehow responsible for both holes.
I do not agree that the defendant was responsible for plaintiff's injury if it occurred on City property. If the plaintiff fell on City property, it was as a result of a missing cover on the Sewerage & Water Board meter box. Mr. Lombard testified that he was required by the City to provide a paved access to his property. However, the majority opinion states that because Mr. Lombard paved that portion of the City's property where the Sewerage & Water Board meter box was or came to be located that somehow tantamount to subjecting the land to his private, personal use and control. The City property paved by Mr. Lombard was no more appropriated to his private use than are public sidewalks and streets in front of homes and businesses. Mr. Lombard's business is a public accommodation and the paving was done to provide access to the public. It was in no way restricted to his personal use. There is no evidence of any defect in the pavement surrounding the Sewerage & Water Board meter box and plaintiff does not contend that the pavement surrounding the Sewerage & Board meter box had anything to do with her fall.
Mr. Lombard admitted to once having lifted the meter cover to see what was in the hole. The majority view this innocent instance of harmless curiosity coupled with the fact that Mr. Lombard could see the area in which the meter was located from a window of a nearby restaurant[1] as acts of domination and control in consequence of which he henceforth should be condemned forever in the future to be liable for whatever mishaps are caused by the meter box. I do not believe that the term "custody" (garde) as used in LSA-C.C. art. 2317 was intended to apply to such insubstantial acts. Even the plaintiff does not suggest that these actions on the part of the defendant had anything to do with her accident.
*297 Mr. Lombard derives no benefit from the meter box. He benefits from water supplied by the Sewerage & Water Board but he could, and I am sure he would if he had the choice, receive the water without the meter box. The meter box exists solely for the benefit of the Sewerage & Water Board, so that it can bill Mr. Lombard. Only the Sewerage & Water Board derives any economic benefit from the meter box. Moreover, there is no contention that the meter box or its installation was defective. The only defect was the missing cover. And this court has held many times as I set forth below that a missing meter cover does not trigger strict liability.
Mr. Lombard did not install the cover on the box. Mr. Lombard did not install the box. Mr. Warren Lawrence of the Sewerage & Water Board testified without contradiction that Mr. Lombard was not responsible for the installation of the water meter box and cover:
Q. The Sewerage and Water Board installed the meter box?
A. The contractor for the Sewerage and Water Board installed the meter box. We inspected the installation, but it was installed by a contractor.
Q. That's used by the Sewerage and Water Board to read the meter for billing purposes?
A. Yes, and for housing the meter actually.
The meter box was not Mr. Lombard's property, nor on his property. He was not expected to furnish a new cover if one were missing. But most significantly it was never established how long it was missing; nor was it shown that the defendant had any notice that it was missing.
This court's previous decisions in Jackson v. Sewerage and Water Bd., 501 So.2d 826 (La.App. 4 Cir.1986), Rigao v. Sewerage & Water Bd. of New Orleans, 467 So.2d 1263 (La.App. 4 Cir.1985), and Baker v. Sewerage and Water Bd., 466 So.2d 720 (La.App. 4 Cir.1985), should be controlling in the instant case.
In Jackson the court specifically held that:
"... a water meter box with a missing cover does not present an unreasonable risk of harm such as is necessary to trigger strict liability under Civil Code article 2317. See Baker, supra, at 722; Rigao, supra, at 1265. Therefore, in order to recover for such an injury, plaintiff must prove negligence under article 2315. Under this negligence theory, defendants are not liable unless it is shown that they had actual or constructive notice of the dangerous condition and failed to remedy it within a reasonable time. Baker, supra, at 722-23; Rigao, supra, at 1265." 501 So.2d at 827.
"Meter readers must read a vast number of meters in a day. Easy access to the meters is a necessity to insure efficiency. The suggestion that they can be locked or bolted hardly seems practical." Rigao, supra, 467 So.2d at 1265. The Sewerage & Water Board is not expected to lock the meter cover, and Mr. Lombard does not have the legal authority to do so. There is no way for Mr. Lombard to protect himself from liability. He has no legal authority to restrict access to the meter. The Sewerage & Water Board is expected to replace missing meter covers, not Mr. Lombard. The meter was never placed in his care by the Sewerage & Water Board. Any effort by Mr. Lombard to exercise control over the meter or its cover would probably have been strenuously resisted by the Sewerage & Water Board. LSA-C.C. art. 2317 "custody" means physical or legal control or both. Mr. Lombard had neither physical, nor legal control over the meter or its cover.
Even if there were some basis for applying strict liability, Mr. Lombard would still have valid defenses. In Loescher v. Parr, 324 So.2d 441, 447 (La.1976), cited by the majority the court stated that the defendant could escape strict liability "... if he shows the harm was caused by the fault of the victim, by the fault of a third person, or by an irresistible force." I feel that the record supports Mr. Lombard in one or more of these defenses:
1. The meter cover was stolen or removed by a third person. No one suggests *298 that Mr. Lombard removed it to lay a trap for Mrs. Thumfort.
2. If not removed by a third person, then the meter cover was removed by an act of God, a freak gust of wind, rising water, etc.
3. In either case the accident occurred through the fault of the victim. The contrast of the hole with the pavement would have been clearly visible even in dim light and Mrs. Thumfort admitted in her own testimony that she took no heed of where she stepped:
"Well, first of all, I looked straight at my car so I couldn't see the hole. If I looked down maybe I would have seen the hole. But I didn't see it."
I find no precedent for imposing liability on an adjoining property owner who did not cause the defect complained of. Lowe v. Therman Supply of Shreveport, 242 So.2d 351 (La.App. 2 Cir.1970), reh. den. (1971), is inapposite. In Lowe there was an allegation of active negligence on the part of the defendant who put his merchandise on the adjoining vacant lot for customer pickup, i.e., the defendant could be characterized as actually conducting his business from the adjoining property. Moreover, the only holding in that case was that plaintiff was contributorily negligent and could not recover. No negligence was found on the part of the defendant.
Although there was no finding of negligence on the party of the defendant in Lowe, if we apply the plaintiff's theory of negligence in Lowe to this case we would reach the opposite result. For in Lowe plaintiff complained that the defendant failed to provide a clear path across the vacant lot adjoining his property for pedestrians coming to do business with him. The logical extension of those facts to this case would result in Mr. Lombard being liable to pedestrians who fell crossing the undeveloped City property only if he failed to pave it. The holding of the majority allows both contradictory positions to be argued with equal validity in the future and defendants will be "dammed if they do, and dammed if they don't."
On the other hand there is strong precedent militating against extending liability to adjoining property owners.
By analogy, adjoining landowners are not responsible for defects in sidewalks even though they are required by law to maintain them. Kuck v. City of New Orleans, 531 So.2d 1142 (La.App. 4 Cir.1988); Houssiere v. Lafayette Ins. Co., 559 So.2d 903 (La.App. 4 Cir.1990). Per force, an adjoining property owner can have no liability for a missing Sewerage & Water Board meter cover which he was not required to maintain; for which he was not expected to furnish replacements; over which he had no control; and where there was no showing he had notice that it was missing. All property owners use and derive benefits from public rights of way. But those kinds of benefits have never been deemed a source of liability to adjoining property owners. We should not ignore Kuck and Houssiere where this court held that if the legislature intends to shift liability to adjoining property owners, it must do so expressly.
As the missing meter cover does not present an unreasonable risk of harm such as is necessary to trigger strict liability under LSA-C.C. art. 2317; and as there was no showing of actual or constructive notice to the defendant that the meter cover was missing, I would hold that he would not be responsible for injuries caused thereby, even had it been located on his property. More importantly, I urge this court to hew to the clear path of powerfully persuasive prevailing precedent eschewing the imposition of liability on adjoining property owners. Had Mr. Lombard actively set up a "sidewalk" vending stand on the City property or fenced it in, I might feel that he could be responsible with notice under some circumstances. Or if he had caused the defect on the adjoining property, he might be held responsible. Simmons v. City of Lake Charles, 368 So.2d 1167, 1170 (La.App. 3 Cir.1979); PeDotti v. Sewerage & Water Board of New Orleans, 250 So.2d 785 (La.App. 4 Cir. 1971). But those things did not happen. It would be naive to believe that the majority's total disregard of Mr. Lombard's property *299 line will not have far reaching ramifications. They dismiss it as a mere "imaginary line" as though it has no legal significance, existing only as a fantasy in Mr. Lombard's mind. Today the majority takes a giant step toward the introduction into Louisiana law of the concept of "liability by proximity" where traditional concepts of negligence or strict liability based upon a valid legal relationship such as physical and/or legal custody (ownership) are discarded in favor of seizing the closest deep pocket unfortunate enough to be in the vicinity at the time the damage occurred.
Surely there must be some reasonable limit to the horizon of liability for defects one does not cause. If one's "imaginary" property line provides no limit, then strict liability shall henceforth be truly limitless as will the potential for legal mischief and caprice. I fail to see what public policy is to be served by making future defendants liable for defects which they are powerless to prevent and over which they exercise no physical or legal control; that they did not cause; and did not know existed on property they do not own. Therefore, I would affirm the judgment of the trial court.
NOTES
[1] The City of New Orleans was also named as defendant, but was never served with notice of the proceedings. The trial judge thus separated plaintiffs' claims against the City from this case.
[2] As noted by the trial judge, it was difficult to determine which hole the plaintiff fell into. The drainage cleanout hole, located on Mr. Lombard's side of the property line was estimated to be about four inches deep, while the water meter hole, located on city property was around one foot deep.
[3] The trial judge noted that the case cited by plaintiff, Dickson v. Wal-Mart Stores Inc., 535 So.2d 800 (La.App.2d 1988), did not support liability on the part of Mr. Lombard. That case dealt with the liability of a storeowner for "premise hazards". The liability in that case is defined in LSA-R.S. 9:2800.6, which details the burdens of proofs and liability of store owners ("merchants") for dangerous conditions located on their premises. The trial judge was thus correct in noting that Dickson did not apply to Mrs. Thumfart's claim against Mr. Lombard. Mr. Lombard was the owner and lessor of the property, and not a "merchant" as defined by the statute.
[4] The case cited by the defendant, Lombard, is also not applicable. Kuck v. City of New Orleans, 531 So.2d 1142 (La.App. 4th Cir.1988). In that case, the City argued that the abutting property owner should be liable for the thing posing an unreasonable risk of injury, even though it was located on city property, in accordance with section 4 of Act 536 of 1950, which places the responsibility of repair on the adjacent property owner. This Court held that even though responsibility for repair may lay with the adjacent property owner, liability did not shift from the City, on whose property the defect was located. In this case, plaintiff is not seeking to shift or place liability on defendant Lombard by way of city ordinances which place responsibility of repair on the abutting landowner. Mrs. Thumfart seeks liability under La.C.C. 2317 against Mr. Lombard based upon his own use and control of the property which contained the water meter hole. Kuck does not stand for the principle that only one party may have custody under 2317. Even if liability may more fairly rest on the Sewerage and Water Board for the plaintiff's injuries, Mr. Lombard may be held liable by his own actions and relationship to the thing causing Mrs. Thumfart's injuries.
[5] We are aware of cases which have stated that a missing cover to a water meter box does not automatically trigger strict liability. Jackson v. Sewerage and Water Board, 501 So.2d 826 (La. App. 4th Cir.1986); Rigao v. Sewerage and Water Board of New Orleans, 467 So.2d 1263 (La. App. 4th Cir.1985). These cases, which always involved public defendants, applied judicially created standards that existed prior to the 1985 legislative enactment of LSA-R.S. 9:2800. This legislation reflected the then current opinions which repeatedly held that the City and public entities could not be held strictly liable for defects on City property and within the custody of the City or public entity. These previous decisions subsequently held that the public defendants could only be found liable upon proof that they had either actual or constructive notice. Jackson, supra at 827; Rigao, supra at 1264-65. Because LSA-R.S. 9:2800 now mandates that actual or constructive notice exist for any 2317 suit against the City or public entity, we need no longer automatically turn strict liability suits against a public body into suits of negligence. Louisiana law has traditionally required proof of some kind of notice before holding public entities liable for the various and numerous defects around the City. This is precisely why the suit against the Sewerage and Water was dismissed in the present case.

However, to hold that a missing cover to a water meter box, as a matter of law, can never constitute a defect would be unreasonable. Such a conclusion would logically mean that similar holes with virtually identical covers, like the drainage hole on Mr. Lombard's property as evidenced by the photographs in the record, could never as a matter of law be considered to pose an unreasonable risk of harm to individuals exercising ordinary care. This we will not do. Because the determination of whether something is a defect is based primarily on factual findings, we will defer to the trial judge's determination that the uncovered hole in the dimly lit parking lot at night constituted a defect.
[6] The trial judge further illustrated his conclusion that La.C.C. 2317 could apply only to property owners in the second page of his reasons for judgment where he states, "Civil Code Article 2317 establishes the doctrine of strict liability. Thus, the owner of premises is strictly liable for defects in the premises."
[7] In oral argument counsel for the defendant admitted that if plaintiff had proven that she fell in the hole located on defendant's property, the defendant would be strictly liable. The holes in question are so close to each other that it is difficult to imagine that Mr. Lombard's eyes would automatically have come to rest and stopped to examine only the hole on his property, disregarding any potential dangers that may have come about from a defect only a few feet away.
[8] $524.81 to Methodist Hospital Emergency Room for tests and treatment on the evening of the accident; $766.88 to Dr. Cracco; $2,662.00 to Dr. Hedgpeth; $15.00 to Dr. Berthier; $9,930.75 to Dr. Colcolough; and $2,917.26 to Dr. Llewellyn.
[9] In Alexander v. Rivers, $90,000 was awarded in general damages for a woman who suffered carpal tunnel syndrome, knee injuries, fractured jaw and loss of some teeth after an automobile accident. Alexander v. Rivers, 560 So.2d 999 (La.App. 4th Cir.1990). In Baio v. Haggerty, plaintiff was awarded $55,000 in general damages for a leg injury which required surgery and several months of physical therapy. Baio v. Haggerty, 558 So.2d 691 (La.App. 1st Cir.1990). In Cascio v. Continental Casualty Co., $75,000 was determined to be a reasonable figure for general damages suffered by a plaintiff who experienced aggravation to a preexisting spinal condition, which possibly required surgery in the future. Cascio v. Continental Casualty Co., 547 So.2d 743 (La.App. 4th Cir.1989), reh. den. (1989). In South Central Bell v. American Holding Corporation, a plaintiff was awarded $20,000 in general damages for injury to her leg after a slip and fall accident. This award was found not inadequate, nor excessive, after the appellate court determined that her alleged resulting leg injury was due mostly to the plaintiff's tennis play and yard work after the accident. South Central Bell Telephone Co. v. American Holding Corp., 548 So.2d 339 (La.App. 1st Cir. 1989). In Lewis v. State of Louisiana, an award of $100,000 was found reasonable for back and knee injuries suffered after a slip and fall accident by woman who had a history of back and leg pain, right knee and back surgery, and who was deemed "permanently disabled" from physical activities prior to her fall. Lewis v. State of Louisiana, 546 So.2d 484 (La.App. 4th Cir.1989), reh. den. (1989).
[1] My review of Mr. Lombard's testimony in the transcript reveals no reference to windows booths, or even just windows. Additionally, the majority reference to Mr. Lombard's statement that he had seen Sewerage & Water Board people working around the meter box within the week prior to the accident is proof that the Sewerage & Water Board, not Mr. Lombard, was exercising control (garde) over the water meter box.